UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 14-CR-404-JMF |
| Plaintiff, | |
| v. | |
| BRENDAN JOHNSTON, | |
| Defendant. | |

DEFENDANT BRENDAN JOHNSTON'S SENTENCING MEMORANDUM

May 13, 2015

Michael Zweiback
*Admitted Pro Hac Vice*
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
213.629.7400

Attorneys for Defendant
Brendan Johnston

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ..................................................................1

II.    STATEMENT OF FACTS....................................................................2

    A.     MR. JOHNSTON'S BACKGROUND .................................2

    B.     OFFENSE CONDUCT .......................................................9

    C.     ████████████████████████████████
                       .....................................11

    D.     ████████████████████████.......................14

III.   ARGUMENT........................................................................14

IV.    CONCLUSION .............................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*United States v. Studley*,
   47 F.3d 569 (2d Cir. 1995) ...................................................................................16

**STATUTES**

18 U.S.C. § 3553(a) ...........................................................................................15

18 U.S.C. § 3553(a)(2)........................................................................................15

# I.
# <u>PRELIMINARY STATEMENT</u>

This Sentencing Memorandum is respectfully submitted in advance of

Brendan Johnston's ("Mr. Johnston") sentencing, which is scheduled for May 27,

2015.

In the midst of ███████ ████████████ marked by failures in school, Mr.

Johnston became involved with Blackshades.  He believed he had found a

legitimate job doing something he loved.  Unfortunately, that involvement and Mr.

Johnston's poor decision to remain with Blackshades for longer than he should

have has led Mr. Johnston here, facing sentencing before this Court.  This

represents Mr. Johnston's first and only violation of the law.  Based on the many

thoughtful letters that have been submitted on his behalf (*see* Exhibit A) and ██

██████████ (Exhibit B), there is no reason to believe that he will ever re-offend.

As detailed below, Mr. Johnston has taken substantial steps towards turning

his life around.  It has been a difficult process.  ███████████ ███████████

████████████████ ██████████████████████████████.

Over the past year, he ███████████ ██████████████████████████████

██████████████████ and has been doing well in school.

Mr. Johnston deeply regrets this mistake and accepts responsibility for his

conduct.  Moreover, ████████████████████████████████████████

████████████████████████████  ████████████████████████████████

████████

An analysis of the factors and goals of sentencing shows that imprisonment

is not warranted in this case.

## II.
## STATEMENT OF FACTS

### A.   MR. JOHNSTON'S BACKGROUND

Mr. Johnston is 24 years old and is the eldest of two children.  (Presentence

Investigation Report ("PSR") ¶ 65.)  Mr. Johnston's father is a captain in the

Ventura County Fire Department, and his mother is an administrative assistant at

an elementary charter school.  (PSR ¶ 66.)  With the exception of a brief period

when he attended school at Northern Arizona University from fall 2010 through

spring 2011, Mr. Johnston has resided with his parents and 22-year-old sister in

Thousand Oaks, California.  (PSR ¶ 75.)

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

Mr. Johnston graduated from Westlake High School in 2008 with a cumulative GPA of 2.51.  (PSR ¶ 90.)  Thereafter, while continuing to live at home, Mr. Johnston attended Moorpark College for two years.  Between the fall of 2008 and spring of 2010, he completed 14 courses with a cumulative GPA of 2.27.  (Exhibit B, p. 4.)  During his last semester, he enrolled in six courses but later withdrew from all of them.  (PSR ¶ 90.)

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████

In the fall 2010, Mr. Johnston enrolled in Northern Arizona University ("NAU"), moving away from home for the first time.  (*Id.*; PSR ¶ 91.)  ████

████████████████████████████████████  There, he lived alone in an apartment rented by his parents.  (Exhibit B, p. 4.)  Mr. Johnston soon began missing class, fell behind, and consequently felt overwhelmed.  (*Id.*)  In November 2010, Mr. Johnston withdrew from all of his courses.  (*Id.*)  His parents were shocked and angry with him and told him to immediately return

home.  (*Id.*)



During the winter of 2010, Mr. Johnston completed an on-line course in anthropology at NAU and received a grade of B, thus demonstrating his ability to perform at school.  (*Id.*)

Mr. Johnston returned to NAU for the spring 2011 semester.

Mr. Johnston's mother was worried about him and arranged for his sister to go and stay with him for a week.

(Exhibit A, p. 11.)[1]  After his sister returned home, Mr. Johnston's mother went to Arizona to stay with him for a week.  (Exhibit B, p. 5.) Mr. Johnston eventually withdrew from all of his classes and returned to his

---

[1]  Exhibit A contains the letters submitted in support of Mr. Johnston, which are consecutively paginated.

parents' home.  (*Id.*)

 Mr. Johnston enrolled in three courses at Moorpark College during summer 2011, but then withdrew ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Exhibit B, p. 5.)

During the summer of 2011, Mr. Johnston began his association with Blackshades after meeting people on the internet who were affiliated with the company.  (Exhibit B, p. 6.)  In order to understand how Mr. Johnston came to the internet forum where he found Blackshades, it is important to understand a bit of his history with internet video games.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮Mr. Johnston found comfort in the virtual world of

online video games.  (PSR ¶ 46.)  There, Mr. Johnston not only interacted with other people, but even became the leader of a clan of other gamers.  Mr. Johnston found great joy, satisfaction, and comfort in the virtual world and in his role as a leader, something he found difficult and even painful in real-life interactions.  (*See* Exhibit A, p. 34 (describing computer as Mr. Johnston's "comfort zone").)  Some players began doing things to knock others offline or to disable rival clans' websites to gain an advantage in the game.  (PSR ¶ 46.)  Mr. Johnston began doing research on the internet to figure out how they did it and how to prevent such attacks in the future.  He posted messages on internet forums about the tools gamers used to knock opponents offline and developed a website to oppose these tools.  (*Id.*)

During this period, Mr. Johnston, who has no history of computer hacking and has not created any malicious computer programs, came to a forum that was used by millions of other people where Blackshades advertised its products, including a product called a remote access tool.  (*See* Exhibit B, p. 6.)  At that time, Mr. Johnston knew that remote access tools were used for acceptable commercial purposes by network administrators to control computers on their network.  (PSR ¶ 46.)  Many different companies marketed and sold remote access tools on the forum.

Mr. Johnston met a person who used the screen name "Marjinz."  Mr.

Johnston learned that Marjinz ran Blackshades.  (PSR ¶ 46.)  The person who had

been promoting Blackshades on the forum left the company and his replacement

was not well-liked.  (Exhibit B, p. 6.)  People on the forum complained that the

person was doing a bad job, so Mr. Johnston sent the person a message offering his

help in "cleaning up his posts."[2]  (*Id*.)  After a couple of weeks of helping with

Blackshades posts, Marjinz contacted Mr. Johnston and asked him to take over the

job of promoting the products on the forum and handling easy customer support

questions.  (*Id.*)

    Mr. Johnston's father looked into Blackshades and thought it was a

legitimate company.  (PSR ¶ 73.)  Mr. Johnston's father reported that the job with

Blackshades was a "lifesaver" for Mr. Johnston.  (Exhibit B, p. 6.)  According to

his father, Mr. Johnston was "talking people through problems" and he "really

enjoyed it."  (*Id.*)  Mr. Johnston's grandmother described how the job with

Blackshades lifted Mr. Johnston's spirits and made him more energized.  (Exhibit

A, p. 6.)  Mr. Johnston's sister explained that Mr. Johnston struggled with self

confidence his entire life and that Mr. Johnston felt a sense of purpose after

receiving praise from his Blackshades boss.  (Exhibit A, p. 11.)

███████████████████████████

███████████████████████████████████

---

[2]  As friends and family describe Mr. Johnston, this was consistent with his character.  His
friends and family describe him as a caring, selfless person who is always willing to help.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

From the fall of 2011 until the fall of 2014, Mr. Johnston took courses at Moorpark College while has was living at home.  (Exhibit B, p. 6.)  During this time, he continued to struggle with school.  (*Id.*)  Over the nine semesters, Mr. Johnston enrolled in 23 courses, but received passing grades in only eight of them. (PSR ¶ 92.)

Mr. Johnston was arrested for the instant offense on May 16, 2014.  (PSR ¶ 40.)

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

In the fall 2014, Mr. Johnston enrolled at California State University, Channel Islands.  He completed three courses in the fall 2014 term with an overall GPA of 3.2.  (PSR ¶ 93.)  He also completed an online course offered by the University of Michigan.

Mr. Johnston is now doing well in school, ██████████████████████████ ██████████████████████████████ (PSR ¶ 72.)

B.    **OFFENSE CONDUCT**

Mr. Johnston is not a computer hacker and has not created any malicious computer code for the purpose of harming others.  Mr. Johnston's role with Blackshades involved sales and customer support.  (PSR ¶ 46.)  His sales activity mainly consisted of posting information about Blackshades on websites.  (*Id.*)  Customer support consisted of responding to customer inquiries on the Blackshades website and setting up Blackshades accounts for new customers.  (*Id.*)  Mr. Johnston could activate new customer accounts, but he never had access to the customer account information stored on the Blackshades servers.

Initially, Marjinz paid Mr. Johnston $500 per month.  Later, Marjinz allowed Mr. Johnston to keep some of the proceeds of products he sold directly through internet forums, while Marjinz kept the proceeds of sales processed through the Blackshades website.[3]  (*Id.*)

After he started working for Blackshades, Mr. Johnston learned that some of Blackshades' customers were using the remote access tool and other Blackshades products for illicit purposes.  (*Id.*)  Mr. Johnston also learned that Marjinz had caused the Blackshades remote access tool to be programmed so that Marjinz could control all of the computers onto which Blackshades customers had installed

---

[3]  While the total gain to the Blackshades organization during the period of Mr. Johnston's involvement was between $70,000 and $120,000 (PSR ¶ 6), Mr. Johnston's personal gain was far less.

the program.  (*Id.*)  Marjinz also had access to recovered passwords and other information stored in all customer accounts on the Blackshades server.  (*Id.*)

After learning how Marjinz was using the Blackshades products, Mr. Johnston continued working for Blackshades and continued posting about and selling the Blackshades products for about 45 days.  Mr. Johnston left Blackshades in about September 2012.  (*Id.*)

Mr. Johnston left Blackshades because he became very uncomfortable with how Marjinz and some of the Blackshades customers were using the products. (*See* Exhibit A, p. 19 (explaining that Mr. Johnston left Blackshades because he did not agree with the direction they were taking the company).)  After leaving Blackshades, Mr. Johnston began posting on forums opposing Blackshades.  He wrote posts exposing the fact that Marjinz and others were using Blackshades tools for illicit purposes.  Mr. Johnston also began working with other people on programs to defeat malware.

It is important to note that Mr. Johnston's primary gain from Blackshades was psychological.  He had found something he did well and received positive feedback for his work.  (PSR ¶ 85.)  He found a sense of purpose working for Blackshades.  (*See* PSR ¶ 70 (Mr. Johnston's parents noticed that his self confidence began to improve while working for Blackshades).)  Once Mr. Johnston realized Marjinz and Blackshades users were engaged in illegal conduct, he should

have left.  But, as Mr. Johnston's friends and family consistently describe him, Mr.

Johnston is kind-hearted and naïve.  He always sees the good in people and always

gives people the benefit of the doubt.  (Exhibit A, p. 19; *see also* Exhibit A, p. 32

(Mr. Johnston can be "unreasonably trusting of others"), p. 16 (Mr. Johnston's

weakness is his "denial of others' wrongdoings").)  Moreover, Mr. Johnston is

adverse to conflict and is reluctant to confront situations.  (Exhibit A, p. 13; *see*

*also* Exhibit A, p. 31 (Mr. Johnston has fragile self esteem and has difficulty telling

people "no"), p. 23 (Mr. Johnston avoids conflict and desires social acceptance).)

**C.**  ██████████████████████████████
████████

██████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████







## III.
## <u>ARGUMENT</u>

A sentence of imprisonment is not appropriate in this case.  Balancing Mr. Johnston's background and characteristics and conduct in this case with the other sentencing factors shows that a sentence of probation is fair and reasonable.

The Court is mandated to impose "a sentence sufficient, but not greater than

necessary, to comply with the purposes" of sentencing set forth in 18 U.S.C.

§ 3553(a)(2).  18 U.S.C. § 3553(a).  Those purposes are (1) to reflect the

seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense; (2) to afford adequate deterrence; (3) to protect the

public from further crimes of the defendant; and (4) to provide the defendant with

needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In determining

what sentence to impose, the Court must consider a number of factors, including

(1) the nature and circumstances of the offense and the history and characteristics

of the defendant; (2) the sentencing goals set forth above; (3) the kinds of

sentences available; and (4) the Guidelines sentencing range.  18 U.S.C. § 3553(a).

In describing the instant offense in the charging documents and to Probation,

the government cites numerous examples of what the Blackshades products, such

as the remote access tool, were capable of doing if put to an improper use.[5]

Indeed, some users of Blackshades products caused harm to numerous victims by

illegally installing the remote access tool onto computers without the knowledge or

consent of the victims, thereby obtaining control of the victims' computers.  The

---

[5]  Of course, remote administrator tools, a.k.a. remote access tools, are commonly used for
perfectly lawful purposes.  For instance, Microsoft offers a Remote Server Administration Tool
for its Windows 7 operating system.  *See* https://www.microsoft.com/en-
us/download/details.aspx?id=7887.  Another popular product readily available on the internet is
Teamviewer, which boasts that it permits users to "[r]emote control any computer or Mac over
the internet within seconds."  *See* https://www.teamviewer.com/en/index.aspx.

various illicit uses of Blackshades products are well-documented in the

Presentence Report.  (*See* PSR ¶¶ 10-27.)

But, a recitation of what the end users were capable of doing or actually did

with the remote access tool and related products does not accurately capture Mr.

Johnston's culpability.  Mr. Johnston's understanding of Blackshades and how the

products were used when he sold them mitigates the seriousness of the offense as it

pertains to Mr. Johnston.  *Cf. United States v. Studley*, 47 F.3d 569, 574 (2d Cir.

1995) (in the context of evaluating liability under the Sentencing Guidelines for

jointly undertaken criminal activity, courts must evaluate the "scope of the

criminal activity agreed upon by the defendant").

Mr. Johnston went to work for Blackshades with the understanding that it

was a legitimate computer software company.  Mr. Johnston's belief that he was

engaged in legitimate work is demonstrated by the fact that he did not hide his new

job from friends or family.  (*See* Exhibit A, pp. 6 and 19.)  In fact, Mr. Johnston's

father did his own "due diligence" and it appeared that Blackshades was a

legitimate company.  (PSR ¶ 73.)  Mr. Johnston's father explained that he was "so

happy and proud" of Mr. Johnston's new job that he "bragged to anyone who

would listen."  (Exhibit A, p. 4.)  Unfortunately, Blackshades turned out to be

something else.

Once Mr. Johnston was fully engaged in his role marketing the Blackshades

products and providing customer support assistance, he came to understand that some people were using Blackshades improperly.  At the same time, however, he also believed that other customers were using the product for legitimate purposes. Mr. Johnston then further learned that Marjinz was using the product illegally as well.  By that point, Mr. Johnston should have left the company, but he did not. The job with Blackshades was a bright spot in a particularly dark part of Mr. Johnston's life. ██████████████████████████████████████ ████████████████████████████████████ That, combined with Mr. Johnston's "immature, naïve, and non-confrontational" character (PSR ¶ 84), led Mr. Johnston to remain in the position for too long.

But, he eventually did leave the company.  Thereafter, he also actively opposed Blackshades by posting about the company on the websites where they advertised.  While this does not erase the harm that victims suffered at the hands of Blackshades users, it sheds light upon Mr. Johnston's personal culpability and is instructive on the issue this Court now faces—that is, what sentence is reasonable for Mr. Johnston.

Mr. Johnston's personal nature and characteristics weigh heavily in favor of a non-custodial sentence.  Mr. Johnston's hairdresser, who is also the mother of one of Mr. Johnston's classmates, summed up Mr. Johnston's character and personality as follows:

17

> He is sweet & simple, honest & loyal. He would go out of his way to
> help a friend. He is awkwardly shy, yet open with his thoughts when
> he is comfortable in his environment. I would describe Brendan as
> the "Gentlest of Giants." He knows right from wrong and was raised
> accordingly. He is non confrontational and has a hard time speaking
> up even when he didn't like his haircut. If he has a flaw, it would be
> that he doesn't appear to be mature and assertive for his age … He
> would NEVER intentionally hurt anyone or anything.

(Exhibit A, p. 25.) Mr. Johnston's other friends and family also consistently

describe him as "kind," "good-hearted," "generous," "gentle," and "caring." (*See,*

*e.g.*, Exhibit A, pp. 16, 18, 19, 22, 23, 29, 36 and 41.) Mr. Johnston is not

malicious and poses no threat to others. (*See* Exhibit A, pp. 19, 25, 29.) As a

young adult, Mr. Johnston would visit his great grandmother when she was ill and

would help his grandmother turn her and feed her. (Exhibit A, p. 6.) As his cousin

explained, Mr. Johnston's "temperate personality" would be crushed by the

"callous heal of imprisonment." (Exhibit A, p. 16.)

The government is likely to claim that a period of imprisonment is necessary

to deter others from committing similar crimes. Mr. Johnston's offense conduct,

culpability, and personal characteristics, however, are unique as compared to other

persons charged with this offense. The assertion that imprisoning him is

appropriate to send a message of general deterrence is narrow-sighted and

completely ignores his unique background, circumstances, and culpability. Mr.

Johnston's home was raided by agents with guns drawn and pointed at him and his

family. He was arrested, charged with, and convicted of a felony. Even if he is

sentenced to probation, that would entail supervision with highly restrictive terms limiting many of his freedoms.  His life is forever changed by this prosecution. Mr. Johnston respectfully disagrees that further punishment in the form of imprisonment for the sake of deterrence is appropriate or reasonable.

Here, a thorough review of the nature and circumstances of Mr. Johnston's offense, his background and characteristics, and the goals and purposes of sentencing lead to the conclusion that a probationary sentence is warranted.  Mr. Johnston is now on an upward trajectory and is turning his life around.  ██████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████

Imprisonment would serve no real purpose at this point and would likely reverse all of the positive strides Mr. Johnston has made over the past year.  To the extent that Mr. Johnston owes a debt to society based on his poor judgment in this case, that debt could be more effectively "repaid" through community service or other alternatives.  But, neither Mr. Johnston nor society would benefit from imprisoning him based upon a vague and imprecise notion of deterrence.  Mr. Johnston and his family are firmly committed to seeing that Mr. Johnston continue on his current path, that he completes his schooling, and that he goes on to become a productive member of society even with the heavy burden of a lifetime with a felony conviction.  (*See* Exhibit A, p. 1.)

To the extent some restriction on Mr. Johnston's liberty is appropriate as punishment for this offense, Mr. Johnston requests that the Court impose a period of home confinement rather than imprisonment.  That would serve to restrict his freedom, provide a consequence for his conduct at Blackshades, and still allow him to continue going to school and ███████████████████████████
██████████████████

## IV.
## CONCLUSION

Mr. Johnston respectfully requests that the Court sentence him to a period of probation.  He has never been in trouble before and deeply regrets how he handled his experience at Blackshades.  With support from his friends and family, he hopes to continue his battle ███████████████, continue his schoolwork, and move on as a productive member of society.

Dated: May 13, 2015

Respectfully submitted,

Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
213.629.7400

By: _Michael Zweiback_
Michael Zweiback, Bar No. 143549
*Admitted Pro Hac Vice*
Attorneys for Defendant
Brendan Johnston

20